IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

PARKERSBURG

SANDRA MARTIN,

      Plaintiff,

v.                                   CASE NO. 6:06-cv-00011

LINDA S. McMAHON,
Acting Commissioner of Social Security[1],

      Defendant.


## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).  Presently pending before the court are the parties' briefs in support of judgment on the pleadings.

Plaintiff, Sandra Martin (hereinafter referred to as "Claimant"), protectively filed an application for DIB on October 20, 2003, alleging disability as of October 20, 2003, due to

---

[1]  Effective January 20, 2007, Linda S. McMahon replaced Jo Anne Barnhart and was named as the Acting Commissioner of Social Security.  Under Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. § 405(g), Linda S. McMahon is automatically substituted as the defendant in this action.

anxiety, right elbow pain, various complaints related to her hands and wrist, and knee and neck problems. (Tr. at 54-56, 61.) The claim was denied initially and upon reconsideration. (Tr. at 35-39, 41-43.) On April 16, 2004, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 44.) The hearing was held on October 14, 2004, before the Honorable Arthur Conover. (Tr. at 274-98.) By decision dated March 25, 2005, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 18-27.) The ALJ's decision became the final decision of the Commissioner on November 14, 2005, when the Appeals Council denied Claimant's request for review. (Tr. at 5-8.) On January 5, 2006, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520 (2005). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The

2

first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2005). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

3

In this particular case, the ALJ determined that Claimant
satisfied the first inquiry because although she worked twenty
hours per week at a health clinic as a receptionist, such work did
not fall within the guidelines for substantial gainful activity.
(Tr. at 18-19.)  Under the second inquiry, the ALJ found that
Claimant suffers from the severe impairments of "right wrist
problems," "musculoskeletal impairment of the neck," "left knee"
and "social anxiety." (Tr. at 19.)  At the third inquiry, the ALJ
concluded that Claimant's impairments do not meet or equal the
level of severity of any listing in Appendix 1.  (Tr. at 20-21.)
The ALJ then found that Claimant has a residual functional capacity
for light work, reduced by nonexertional limitations.  (Tr. at 24.)
As a result, Claimant cannot return to her past relevant work.
(Tr. at 25.)  Nevertheless, the ALJ concluded that Claimant could
perform jobs such as stationary guard and crossing guard, which
exist in significant numbers in the national economy.  (Tr. at 25.)
On this basis, benefits were denied.  (Tr. at 25.)

Scope of Review

The sole issue before this court is whether the final decision
of the Commissioner denying the claim is supported by substantial
evidence.  In Blalock v. Richardson, substantial evidence was
defined as

> "evidence which a reasoning mind would accept
> as sufficient to support a particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less

4

> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty

to scrutinize the record as a whole to determine whether the

conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the

Commissioner in this case is not supported by substantial evidence.

Claimant's Background

Claimant was fifty-three years old at the time of the

administrative hearing.  (Tr. at 278.)  Claimant graduated from

high school and took a few college courses.  (Tr. at 278, 280.)  In

the past, Claimant worked full time as a receptionist at a primary

care facility.  At the time of the administrative hearing, she

continued to work at this facility, but had dropped down to twenty

hours per week because of her deteriorating health.  (Tr. at 278-

29.)

The Medical Record

The court has reviewed all evidence of record, including the

5

medical evidence of record before and after her alleged onset on October 20, 2003, and will summarize it briefly below.

The record includes treatment notes from Endocrine Diagnostics dated November 20, 1996, through December 16, 1999. Plaintiff was mostly treated for issues related to weight loss, but on August 20, 1998, Claimant complained of right hand and arm pain and was diagnosed with probable carpal tunnel syndrome. (Tr. at 107.) On December 3, 1998, she complained of pain in her left knee and difficulty with grip on the right. (Tr. at 106.)

The record includes treatment notes from Kalapala S. Rao, M.D. dated March 15, 2000, through April 13, 2000. On March 15, 2000, Claimant complained of right hand pain for several years. Tinnel's sign was positive. Phalen's sign was questionable positive. Pinch test and Finkelstein test were negative. Dr. Rao diagnosed tendonitis with possible dequivains and rule out carpal tunnel syndrome. (Tr. at 117.) An EMG nerve conduction study on April 13, 2000, revealed mild right median nerve neuropathy and no evidence of carpal tunnel syndrome or radiculopathy. (Tr. at 221.) On April 13, 2000, Dr. Rao noted that Claimant's symptoms had improved, but that she still had pain in her forearms and upper arm on and off. Claimant had full range of motion in the right upper extremity and muscle strength was grossly normal. Dr. Rao noted the results of the EMG and recommended that Claimant wear a thumb strap. He diagnosed tendonitis and right median nerve neuropathy.

Claimant was to be off work for two weeks.  (Tr. at 222.)

On October 15, 2001, Thomas R. Hunt, M.D. of the Cleveland Clinic examined Claimant, reviewed her MRI and diagnosed suspected symptomatic interosseous ganglion cyst, right distal dorsal scaphoid versus osteoid osteoma.  Dr. Hunt explained that the diagnosis was uncertain.  "However, one must suspect not only an intraosseous ganglion cyst, but also an osteoid osteoma." (Tr. at 119.)  Dr. Hunt recommended curettage and bone grafting of the cyst.  Claimant underwent this surgery, though the discharge summary and other records related thereto are not of record.

The record includes treatment notes and other evidence from James M. Dauphin, M.D. dated November 1, 1999, to January 11, 2000, and September 28, 2003, and October 13, 2003.  (Tr. at 131-34, 226-29.) X-rays of the right knee on October 14, 1999, were negative. On November 1, 1999, Dr. Dauphin examined Claimant related to possible arthritis and heel and knee pain.  Claimant's right heel was tender.  Her hands were not swollen.  Dr. Dauphin referred Claimant to another physician for heel injections.  (Tr. at 229.) On December 30, 1999, Claimant returned with severe heel pain.  Dr. Dauphin diagnosed plantar fascitis and injected Claimant's heel. (Tr. at 227.) On January 11, 2000, Claimant continued to do poorly regarding her heel.  Dr. Dauphin recommended use of soft shoes, nonsteroidal anti-inflammatory drugs and orthotics.  X-rays of the left knee on July 18, 2003, showed minimal degenerative changes

7

with minimal spurring of the patella.  (Tr. at 232.)  On September 28, 2003, Dr. Dauphin diagnosed sprain of unspecified site of the wrist and aseptic necrosis of the head and the neck of femur.  Dr. Dauphin recommended an MRI.  (Tr. at 132.)  Claimant had an MRI on October 4, 2003.  (Tr. at 133-34.)  On October 13, 2003, Dr. Dauphin noted that Claimant's MRI showed "degen[erative] changes in the hand with S-C dissociation and arthritis in other joints." (Tr. at 131.)  Dr. Dauphin noted full range of motion and pain with certain activities, including grip and pinch.  In addition, he noted that Claimant often has writer's cramp.  He diagnosed sprain of unspecified site of the wrist and aseptic necrosis of the head and neck of the femur.  (Tr. at 131.)  Dr. Dauphin recommended that Claimant reduce her hours to twenty per week, "probably permanently[,] evaluate for hypertension and anxiety as well[,] may need disability."  (Tr. at 131.)

The record includes treatment notes and other evidence from L. Scott Sole, M.D. dated October 25, 2000, through October 13, 2003. On October 25, 2000, Dr. Sole, a neurologist, wrote that he examined Claimant related to difficulty with her right hand. Claimant reported that her condition had worsened in the last several months and that when she writes, her thumb relaxes and she has to reposition her hand.  Claimant also reported complaints of wrist and neck pain.  Dr. Sole felt that this could be a subtle form of writer's dystonia.  Dr. Sole prescribed Neurontin.  (Tr. at

141-42.)   On November 29, 2000, Dr. Sole noted no significant changes.  Claimant reported some improvement with Neurontin.  Dr. Sole recommended an MRI of the brain and cervical spine.  (Tr. at 140.)  Claimant underwent an MRI of the brain and cervical spine on December 4, 2000.   The MRI of the cervical spine showed no appreciable disc herniation, spinal stenosis or significant compromise of the canal, but did show some minor narrowing of the C5-6, C6-7 disc interspaces.  (Tr. at 146.)  On January 29, 2001, Claimant reported some improvement in her pain with Neurontin.  Dr. Sole increased Claimant's Neurontin.  (Tr. at 139.)  On June 27, 2001, Claimant reported her pain was worse with other daily activities in addition to writing.  Claimant had severe tenderness to palpation over the wrist joint.  (Tr. at 137.)  Dr. Sole increased Claimant's medication, Mysoline, and recommended an MRI of the wrist.  (Tr. at 137.)  An MRI of the right wrist on July 10, 2001, showed a

> [f]ocal area of diminished signal intensity is appreciated in the distal lateral aspect of the navicular bone which shows some increased signal intensity on the gradient echo and STIR images.  This likely is attributable to small area of avascular necrosis or post traumatic or degenerative in nature.  You may want to consider obtaining a bone scan which should show some increased activity in this area if this is, in fact, representative of focal area of avascular necrosis.

(Tr. at 144.)  A bone scan on July 26, 2001, showed slightly increased uptake on the left side at the L3-4 level, questionable hypertrophic spurring and/or degenerative change.  The remainder of

the spine appeared unremarkable.  (Tr. at 233.)

On October 13, 2003, Claimant reported to Dr. Sole that she had undergone surgery on her hand at Cleveland Clinic.  Claimant reported no significant improvement in her dystonic symptoms, which are initiated with writing.  Claimant continued to have difficulty with her thumb coming back when she writes.  Claimant's examination was essentially unchanged.  Dr. Sole noted that arm pain had improved somewhat with questionable dystonia and that it could represent a focal form with writer's cramp.  (Tr. at 136.)

The record includes treatment notes and other evidence from Cynthia Martinsen, D.O. dated February 28, 2000, to November 4, 2003.  (Tr. at 147-88.)  Over the course of her treatment, Dr. Martinsen's treatment notes mention anxiety and that Claimant was prescribed BuSpar, Prozac and Elavil.  (Tr. at 149, 151, 159, 167-68, 170, 248, 253.)  On September 27, 2000, Claimant complained of difficulty writing because her thumb would lift up and become weak. The problem had worsened recently.  Dr. Martinsen diagnosed DeQuervain's syndrome/tendonitis in the right thumb and mild medial nerve neuropathy.  Claimant underwent a trigger point injection. Dr. Martinsen told Claimant to stay off work for two weeks and to avoid repetitive motion such as typing or writing.  (Tr. at 165.) On October 11, 2000, Claimant reported some improvement in her right wrist, which she had not been using for two weeks.  Claimant reported constant pain.  Dr. Martinsen referred Claimant to a

surgeon.  (Tr. at 162.)  An MRI of Claimant's cervical spine on October 21, 2000, showed mild cervical spondylosis at C5-6 and C6-7, facet osteoarthritis at C7-T1 and no evidence of acute fracture or instability.  (Tr. at 176.)

On September 5, 2001, Claimant continued to complain of right wrist and arm pain.  Dr. Martinsen referred Claimant to the Cleveland Clinic for treatment of her condition, which Dr. Martinsen described as "[m]ost likely avascular necrosis of the navicular bone."  (Tr. at 157.)  On March 27, 2002, Claimant was without complaint.  (Tr. at 155.)  On July 17, 2003, Claimant complained of left knee joint pain and wanted to discuss options regarding her wrist.  Dr. Martinsen ordered an x-ray of the knee and a wrist immobilizer, among other things.  (Tr. at 149.)  On July 23, 2003, Dr. Martinsen diagnosed osteoarthritis of the left knee and administered an injection.  (Tr. at 148.)  On September 6, 2003, Claimant reported her right hand thumb pain and weakness had worsened.  Dr. Martinsen diagnosed osteoarthritis of the knees and hands and possible dystonia of the right thumb.  She prescribed Vioxx and a thumb splint.  (Tr. at 147.)  X-rays of the right wrist and left knee on November 4, 2003, were negative.  (Tr. at 172.)

A State agency medical source completed a Psychiatric Review Technique form on January 5, 2004, and opined that Claimant had no medically determinable mental impairments.  (Tr. at 189-01.)  That opinion was affirmed on February 23, 2004.  (Tr. at 189.)

A State agency medical source completed a Physical Residual Functional Capacity Assessment on January 6, 2004, and opined that Claimant could perform medium work, that she could never climb ladders, ropes or scaffolds and that she was limited in handling, fingering and feeling. (Tr. at 205-11.) The opinion was affirmed on February 23, 2004. (Tr. at 212.)

At the request of Claimant's counsel, Tony R. Goudy, Ph.D. examined Claimant on September 28, 2004. Claimant reported she had never engaged in individual psychotherapy, but that she had taken several medications over the years, including BuSpar and Prozac. (Tr. at 238.) Dr. Goudy diagnosed social anxiety disorder on Axis I and made no Axis II diagnosis. He rated Claimant's GAF at 55-60. Dr. Goudy opined that Claimant had mild to moderate limitation in her activities of daily living, moderate to marked limitations in social functioning, moderate impairment in pace only and no episodes of decompensation for an extended duration. (Tr. at 241.)

Dr. Goudy completed a Mental Assessment of Ability to do Work-Related Activities (Mental) on which he opined that Claimant had a marked limitation in the ability to relate predictably in social situations and moderate to marked limitations in her ability to relate to co-workers and deal with the public. (Tr. at 243-45.)

On November 3, 2004, Michael Shramowiat, M.D. examined Claimant related to her complaints of right wrist pain and bilateral knee pain. Claimant reported mainly right wrist pain

with increased hand activity and any prolonged tabletop activity. In addition, she reported difficulty with prolonged walking and stair climbing.  On physical examination, Claimant had bilateral upper extremity strength of 5/5.  Sensation was grossly intact and symmetrical to light touch in the bilateral upper extremities. Claimant had pain in the right wrist with palpation.  She had some joint hypertrophy at the DIP and PIP joints in both hands. Claimant had moderate to severe crepitus of both knees with active and passive range of motion.  She had full range of motion in both knees.  Dr. Shramowiat diagnosed osteoarthritis and osteoarthritis of the knee and opined that Claimant was unable to "perform any type of work that involves stair climbing or any extended walking." (Tr. at 255.)

Dr. Shramowiat completed a Medical Assessment of Ability to do Work-Related Activities (Physical) on November 16, 2004.  Dr. Shramowiat opined that Claimant could lift five pounds infrequently and stand/walk for one hour in an eight-hour workday and for ten minutes without interruption.  He opined that Claimant can sit for four hours out of an eight-hour workday and for thirty minutes without interruption.  He opined that Claimant could climb stairs very infrequently and should never balance, stoop, crouch, kneel or crawl.  Claimant should avoid heights, temperature extremes and vibrations.  Dr. Shramowiat opined that Claimant should reach, handle, finger and feel infrequently.  (Tr. at 256-58.)

13

John R. Atkinson, Jr., M.A. examined Claimant at the request of the State disability determination service on November 19, 2004, after the ALJ approved counsel for Claimant's request at the administrative hearing that Claimant undergo a consultative mental examination.   Claimant stated that she is intimidated by supervisors at work and must sometimes leave her desk and go to the restroom to calm down.   Claimant reported that her arthritis also causes pain in her wrist, fingers and neck.   (Tr. at 261.) Claimant reported that on the two and a half days per week that she works, she works from 7:30 or 8:00 a.m. to 4:00 or 6:30 p.m.   If she is not working, she does "a little something in the house, supper, clean the bathroom, TV is on and have lunch, TV or on the computer, check the e-mail, got a little dog, let her out, fix dinner at 5:00 or 6:00 in the evening, TV, on the computer, my granddaughter, help her with schoolwork, bed about 11:00." (Tr. at 266.)   Claimant reported doing a full range of housework and chores with help from her husband and granddaughter.   (Tr. at 266.)   Mr. Atkinson diagnosed anxiety disorder, not otherwise specified and dysthymic disorder on Axis I and made no Axis II diagnosis.   (Tr. at 267.)

Mr. Atkinson completed a Medical Assessment of Ability to do Work-Related Activities (Mental) on November 23, 2004, and opined that Claimant had poor abilities to relate to co-workers, deal with the public, interact with supervisors and deal with work stresses

14

and fair to good abilities in the remaining areas.  (Tr. at 269-71.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in his residual functional capacity finding and, as a result, Claimant's case should be reversed and remanded for an award of benefits. (Pl.'s Br. at 7-16; Pl.'s Reply at 1-6.)  If the matter is not reversed outright, Claimant argues that this matter should be remanded for proper vocational expert testimony because the ALJ never asked the vocational expert if the jobs identified were consistent with the definition in the <u>Dictionary of Occupational Titles</u> ("DOT").  Claimant further asserts that according to the DOT, the jobs of crossing guard and watch guard require a "temperament for dealing with people....  Therefore, neither of these jobs would be appropriate for an individual who needed to work alone or with a small group of coworkers." (Pl.'s Br. at 17.)

The Commissioner argues that substantial evidence supports the ALJ's finding that Claimant was not disabled. (Def.'s Br. at 6-10.)  Regarding Claimant's DOT argument in particular, the Commissioner, relying on <u>Rutherford v. Barnhart</u>, 399 F.3d 546 (3d Cir. 2005), argues that "courts have been skeptical of this unduly technical argument." (Def.'s Br. at 10.)  In addition, the Commissioner argues that Claimant's counsel challenged the

vocational expert that these jobs would require too much interaction with the public, but she "explained that the identified jobs, although occurring in a public area, did not require direct contact with large groups (Tr. 293)." (Def.'s Br. at 10.)

Social Security Ruling (SSR) 00-4p states that

> [w]hen a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, *4 (Dec. 4, 2000).

In his decision, the ALJ wrote that "[t]he vocational expert responded that the jobs cited were consistent with the DOT and its companion publication." (Tr. at 25.) In fact, the ALJ never questioned the vocational expert about the consistency of her testimony with the DOT. (Tr. at 290-95.)

At the administrative hearing, the ALJ posed a hypothetical question that limited Claimant to jobs that do not "involve large crowds of people, best if she were to work alone or with a small group of coworkers, shouldn't be involved in sales work, teacher aide work and work w[h]ere only minimal supervision is necessary," among other limitations. (Tr. at 292.) In response, the vocational expert identified the jobs of stationery guard (light),

16

surveillance system monitor(sedentary) and crossing guard (light). (Tr. at 292-93.)  In his decision, the ALJ found that Claimant could perform the light jobs of stationary guard and crossing guard.  (Tr. at 25.)

Although the vocational expert did not give DOT numbers for the jobs she identified, the DOT indicates that the jobs of school crossing guard (371.567-010), gate guard (372.667-030) and surveillance system monitor (379.367-010) all involve speaking and signaling, which are defined as "[t]alking with and/or signaling people to convey or exchange information.  Includes giving assignments and/or directions to helpers or assistants."  U.S. Department of Labor, Dictionary of Occupational Titles 371.567-010, 372.667-030, 379.367-010 and Appendix B (4th ed. 1991).  These jobs all also refer to  "[d]ealing with people." Id. at 371.567-010, 372.667-030 and 379.367-010.  Though the court could not locate an explanation as to what "dealing with people" means in the DOT, it would appear there is at least a potential conflict between the vocational expert's testimony that the jobs identified do not involve large crowds and mainly involve working alone or with small groups and the DOT definition indicating the jobs ultimately adopted by the ALJ require a temperament for dealing with people.

Finally, the court finds the Commissioner's reliance on Rutherford v. Barnhart, 399 F.3d 546 (3d Cir. 2005) unconvincing. In that case, the vocational expert only once provided evidence

17

about the requirements of a job or occupation and, only in the context of testifying about the requirements of the claimant's past employment. <u>Id.</u> at 557. In the instant matter, the vocational expert testified about the requirements of the jobs she identified. In particular, she testified that the jobs would not involve direct contact with large crowds, though she also stated that the crossing guard job would involve contact with children periodically throughout the day. (Tr. at 293.) In any event, the vocational expert testified about the requirements of the two jobs ultimately adopted by the ALJ, the ALJ failed to ask the vocational expert about any conflict between the DOT and her testimony and it appears there may be a conflict between the DOT definition and the vocational expert's testimony.

Based on the above, the court is constrained to recommend that the presiding District Judge remand this matter for further proceedings.

Claimant raises additional arguments as to why the ALJ's decision is not supported by substantial evidence. The court declines to address these arguments, as they can be addressed on remand.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge REVERSE the final decision of the Commissioner, and REMAND this case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g)

and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Joseph R. Goodwin.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to counsel of record.

_February 12, 2007_
     Date

Mary E. Stanley
United States Magistrate Judge